NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JONATHAN GALATZAN (Cal. Bar No. 190414)
Assistant United States Attorney
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2727
    Facsimile: (213) 894-0142
    E-mail: Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>       vs.<br><br>$103,668.46 IN FUNDS SEIZED FROM EAST WEST BANK ACCOUNT 8739,<br><br>    Defendant. | No. 2:18-cv-07505<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. §§ 981(a)(1)(A) and (C) and 984<br><br>[FBI] |

    Plaintiff United States of America brings this claim against defendant $103,668.46 In Funds Seized From East West Bank Account 8739, and alleges as follows:

JURISDICTION AND VENUE

    1.    This is an in rem civil forfeiture action brought pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

2. This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America ("plaintiff" or the "government").

5. The defendant is $103,668.46 In Funds from East West Bank Account (the "defendant account funds"), which is a bank account with the last four digits ending in 8739[1] held in the name of Todd J. Schellbach and Tiffany Ann Henschel, trustees of the Cartwright No. 2 Trust, and was seized on March 15, 2018 by the Federal Bureau of Investigation pursuant to a federal search warrant at East West Bank, 27421 Hawthorne Boulevard, Rolling Hills Estates, California.

6. The defendant account funds are currently in the custody of the United States Marshals Service in this District, where it will remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Todd J. Schellbach ("Schellbach"), Tiffany Ann Henschel ("T. Henschel"), Michael Henschel ("M. Henschel"), and Todd J. Schellbach and Tiffany Ann Henschel, trustees of the Cartwright No. 2 Trust ("the Trust") may be adversely affected by these proceedings.

---

[1] Pursuant to Fed. R. Civ. P. 5.2(a)(4) and Local Rule 5.2-1, only the last four digits of financial account numbers are set forth in this Complaint.

FACTS SUPPORTING FORFEITURE

The Real Estate Fraud Scheme

8. Since at least March 2009, M. Henschel and other co-conspirators were involved in a real estate fraud scheme generally described as follows:

9. M. Henschel and other co-conspirators worked for, through, and with a business that M. Henschel owned and operated out of offices in Van Nuys, California, under numerous business names, including, but not limited to Carson Covina Associates and Cartwright No. 2 Trust.

10. M. Henschel and other co-conspirators identified homeowners who were in financial distress and/or who held equity in real properties that could be targeted as part of the fraud. The targeted homeowners included those who had defaulted on their mortgages, who owned real property subject to foreclosure proceedings, who were interested in refinancing or obtaining new mortgages, who owned real properties in disrepair, or who owned real properties subject to tax liens, other creditor liens, and tort actions (collectively, the "targeted homeowners" or "homeowners").

11. M. Henschel and other co-conspirators falsely represented to the targeted homeowners that M. Henschel was a sophisticated real estate investor and an attorney who, if the homeowners wanted to sell their real properties, would purchase the real properties at fair market value and on fair market terms and, if the homeowners wanted to keep their real properties, would help them protect their real properties from creditors and other competing claims by, among other methods,

3

1 placing the real properties in a trust.

2     12. M. Henschel and other co-conspirators convinced targeted homeowners, using false pretenses and misrepresentations of material facts, to sign fraudulent documents including: (i) fraudulent grant deeds purporting to convey an interest in real properties to M. Henschel-controlled entities – sometimes deeding properties to M. Henschel-controlled entities outright; (ii) fraudulent trust deeds recording an interest in properties based on fictional loans supposedly guaranteed by the targeted homeowners; and (iii) other fraudulent liens recording an interest in properties based on fictional debts supposedly owed by the targeted homeowners.

13. M. Henschel and other co-conspirators recorded and caused others to record fraudulent grant deeds relating to the targeted homeowners' real properties. These fraudulently filed documents are collectively referred to as "fraudulent recordings."

14. The fraudulent recordings caused county recorder offices, including the Los Angeles County Recorder's office, to mail the original of the filings to addresses that M. Henschel and other co-conspirators designated. Such mailings helped make the fraudulent recordings appear legitimate, by providing homeowners and others copies of legally recorded instruments. The mailings were also part of the recording process that resulted in the fraudulent recordings appearing on title to the real properties, which themselves transferred title to M. Henschel-controlled entities.

4

15. M. Henschel and other co-conspirators used escrow companies to close transactions and completed transfers of real properties in part to make it appear that the transfers were legitimate and carried out on terms to which the targeted homeowners had agreed.

16. Once M. Henschel and other co-conspirators had control of the targeted homeowners' properties, they would profit from the scheme in a variety of ways, including reselling the properties to innocent third parties for a substantial profit.

<u>False Representations to Clients</u>

<u>Homeowner ManG</u>

17. During 2012 or 2013, ManG, (68 years old) and her ex-husband were going through a divorce. Together they owned properties that were generating more than $20,000 in rental income per month. The properties were valued at approximately $5 million in the divorce proceedings.

18. ManG's ex-husband did not want to negotiate directly with ManG regarding the properties, so he signed over power of attorney to their daughter so that she could represent him in the divorce proceedings. ManG asked her pastor Reuben Elias ("Elias") to negotiate the divorce settlement for her. They all agreed that the properties should be sold as part of the divorce proceedings.

19. In an effort to facilitate the selling of the properties, ManG's daughter put ManG in touch with a friend who was a real estate agent named Kim Reese ("Reese"). Reese told ManG and Elias that she had found an investor group to purchase the properties. At one point, Reese brought a representative of

5

the investor group to meet with ManG and Elias and, at this meeting, Reese and the unnamed representative tried to convince Elias and ManG that ManG should sign legal documents to sell the properties for approximately $2.5 million.

20. At some point in the divorce proceedings, ManG's divorce lawyer told ManG and the pastor that he thought the price offered by the so-called investor group was a fair price because the properties were not in good condition. Elias did not agree that ManG should accept this price without an independent appraisal, which he tried to obtain without success. He understood that the buildings on the properties might not be in good condition, but the properties themselves could be valuable simply for their location.

21. Elias told ManG not to sign the documents at the initial meeting with Reese and the representative of the investor group, and she did not. Soon after this meeting, Reese and ManG's daughter went to ManG's house with documents for ManG to sign. The documents would transfer property to the so-called investor group. ManG was given documents to sign that she did not read or understand. Elias told her not to sign anything without ManG's attorney reviewing them.

22. Reese then called ManG's attorney, and although the attorney told Reese that he would need to review everything before ManG signed anything (according to information that ManG and Elias had subsequently learned), Reese told ManG that ManG's attorney said everything was okay and that she should sign the documents. ManG briefly spoke to her attorney, who told her that everything was okay, which she later understood to have

1 meant that the attorney would review the documents and get back
2 to her, but which at the time she believed meant she should sign
3 the documents.
4     23.   Reese and ManG's daughter then took ManG to a notary
5 and had her sign legal documents transferring title of all of
6 ManG's properties to entities controlled by M. Henschel.  ManG
7 signed the documents even though she could not read or
8 understand them, since they were in English, but took comfort in
9 the fact that her daughter was there.  ManG understood that the
10 investor group intended to sell the properties to third parties.
11 ManG signed documents because she was expecting that the sale to
12 the investor group would yield proceeds of at least $2.5
13 million.
14     24.   ManG did not receive $2.5 million for the sale of the
15 properties, but only approximately $245,000, and she received
16 that only after she complained to Reese and others that she had
17 not received anything at all and had essentially been cheated by
18 M. Henschel's group out of her properties.
19     25.   An entity named Carson Covina Associates acquired
20 ManG's properties from ManG in 2014 and 2015 – acquiring a total
21 of four properties from ManG and her husband in this time
22 period.  Ownership of three of these properties transferred from
23 ManG and her husband to Carson Covina Association in May 2014
24 through grant deeds that appear to have been signed by ManG and
25 ManG's daughter for ManG's husband.  A fourth property was
26 transferred in January 2015 through a similar grant deed.  The
27 properties were almost immediately transferred from Carson
28 Covina Associates to third parties for a substantial profit.

26. Public records, escrow documents, and bank records show that Carson Covina Associates sold the four properties acquired from ManG for nearly $2.5 million almost immediately after the properties were acquired from ManG, while ManG received only about $245,000 from M. Henschel's group in connection with these property transfers. Escrow documents show that additional payments, totaling approximately $139,000, were paid from escrow accounts to ManG's attorney, supposedly for ManG's benefit in connection with the transfers, but this $139,000 did not go to ManG.

27. M. Henschel controlled the investor group that took control of ManG's properties, including controlling the entity, Carson Covina Associates, in whose name the properties were acquired.

East West Bank Account 8739

28. M. Henschel, along with other co-conspirators, opened and caused others to open bank accounts in co-conspirators' names and the names of other aliases and alter egos, including Henschel's family members, in part to hide M. Henschel's involvement in the fraud. East West Bank account 8739 was held in the names of Schellbach, T. Henschel, and the Trust, with Schellbach and T. Henshel listed as signatories. Schellbach and T. Henschel are M. Henschel's stepson and daughter, respectively.

29. On December 4, 2014, a check from Mi Casita Escrow for $250,000.00 was deposited into East West Bank account 8739. The memo on the check listed "Escrow No. 141192-LV", which relates

1  to one of the properties that ManG transferred to Carson Covina
2  Associates as described above.
3   30.  On December 9, 2014, another check from Mi Casita
4  Escrow for $250,000.00 was deposited into East West Bank account
5  8739.  The memo on the check listed "Escrow No. 141215-LV",
6  which relates to one of the properties that ManG transferred to
7  Carson Covina Associates as descried above.
8   31.  On March 15, 2018, the government seized $103,668.46
9  (*i.e.*, the defendant account funds) which represented the
10 remaining tainted funds in East West Bank account 8739.
11  32.  On March 8, 2018, M. Henschel and other co-
12 conspirators, were indicted by a federal grand jury in this
13 District.  *See* <u>United States v. Henschel</u>, No. CR 17-00350-VAP.

### FIRST CLAIM FOR RELIEF

15  33.  Based on the above, plaintiff United States of America
16 alleges that the defendant account funds constitute or are
17 derived from proceeds traceable to violations of 18 U.S.C. §
18 1341 (mail fraud), which is a specified unlawful activity as
19 defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).  The
20 defendant account funds are therefore subject to forfeiture
21 pursuant to 18 U.S.C. § 981(a)(1)(C).  To the extent that the
22 defendant account funds are not the actual monies directly
23 traceable to the illegal activity identified above, plaintiff
24 alleges that the defendant account funds are identical property
25 found in the same account or place as the property involved in
26 the specified offense, rendering the defendant account funds
27 subject to forfeiture pursuant to 18 U.S.C. § 984.
28

SECOND CLAIM FOR RELIEF

Based on the above, plaintiff United States of America alleges that the defendant account funds constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956, or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. § 1341 (mail fraud). The defendant account funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). In addition, to the extent that the defendant account funds are not the actual monies directly traceable to the illegal activity identified above, plaintiff alleges that the defendant account funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant account funds subject to forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendant account funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should be not be decreed;

(c) that this Court decree forfeiture of the defendant account funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: August 28, 2018

NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

    */s/ Jonathan Galatzan*
JONATHAN GALATZAN
Assistant United States Attorney
Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

11

## VERIFICATION

I, Heather Campbell, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI").

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 28, 2018 in Los Angeles, California.

/s/ Heather Campbell
HEATHER CAMPBELL
SPECIAL AGENT - FBI